WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Deyoe R. Harris, | No. CV-14-02453-TUC-LCK |
| Plaintiff, | **ORDER** |
| v. | |
| University of Arizona Police Department, et al., | |
| Defendants. | |

Pending before the Court is City Defendants' Motion for Summary Judgment with accompanying statement of facts. (Docs. 127, 128.) Plaintiff Deyoe Harris responded to the motion and statement of facts. (Docs. 137, 140, 151.) Defendants replied. (Doc. 153.) The Court denies summary judgment to Defendant Dellinger because there is a genuine issue of material fact precluding qualified immunity. The Court grants summary judgment to Defendants Pelton, Placencia, Krammes, and Heivilin.

## **SUMMARY JUDGMENT STANDARD**

In deciding a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987). Summary judgment is appropriate if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those

"that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## **FACTS**

### **Source of Facts upon Which the Court Relies**

Harris submitted a response to Defendants' enumerated facts in support of the motion for summary judgment. (Doc. 140.) Harris's document does not identify any genuine issues of fact. Harris fails to cite to record evidence to dispute particular facts. Rather, he cites what he considers contradictions in officer testimony as a basis to undermine all of Defendants' evidence. The Court cannot resolve credibility disputes on summary judgment. *See Anderson*, 477 U.S. at 256. Further, most of the statements upon which Harris relies do not undermine the facts as set forth by Defendants. For example, Harris disputes the entirety of witness Holly Hall's testimony for non-material inconsistencies – she testified to speaking with one officer but some of the officers indicate two or three of them were present. (Doc. 140 at 2-3.) Such minor discrepancies do not undermine Hall's testimony for purposes of summary judgment.

Harris filed a subsequent document in which he set forth his own version of the facts. (Doc. 151.) First, Defendants object to this document as untimely, because it was filed after the dispositive motion deadline. Harris does not cast this document as a motion for summary judgment but as a supplemental response to Defendants' motion for summary judgment. Defendants filed their motion for summary judgment on April 12, 2017. (Doc. 127.) Harris had thirty days to respond to the motion. LRCiv 56.1(d). His initial response was filed on April 17, and the supplement was filed on April 26, both well within the thirty-day deadline and prior to Defendants' May 2 reply brief. Second, Defendants object to the document as merely conclusory allegations insufficient to oppose a motion for summary judgment. The Court disagrees. In paragraphs 5-17 and 19-30, Harris sets forth in detail his version of the events of March 6, 2013. (Doc. 151 at 4-5.) Although not submitted as a formal affidavit, the document is signed by Harris and

identified as his version of the facts (Doc. 151). *See Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985) (construing the opposing party's papers more liberally than the movant). Under the Local Rules of the District, a party shall set forth any additional facts that he believes establish a genuine issue of fact. LRCiv 56.1(b)(2). A detailed personal affidavit of the party is sufficient to dispute a motion for summary judgment. *See United States v. 1 Parcel of Real Property, Lot 4, Block 5 of Eaton Acres*, 904 F.2d 487, 491 (9th Cir. 1990). Therefore, to the extent Harris's factual assertions in this document contradict the facts as set forth by Defendants, the Court relies upon Harris's version and all reasonable inferences are drawn in his favor. *See LaLonde v. Cty. of Riverside*, 204 F.3d 947, 953-54 & n.10 (9th Cir. 2000); *Mattos v. Agarano*, 661 F.3d 433, 439 (9th Cir. 2011). The Court does not include or rely upon Harris's conclusory allegations or his legal conclusions.

**Facts the Court Relied Upon in Deciding the Motion for Summary Judgment**

On March 6, 2013, Harris had a mid-term exam at the University of Arizona with Professor Jenann Ishmael. (PSOF ¶ 5; Doc. 115-1 at 2.) He went to Café Passe (415 North 4th Avenue) for a coffee before his test. (PSOF ¶ 6.) Harris forgot cash at his apartment (333 West Drachman Road) and attempted to convince the young lady at the counter "MAYBE LOUDLY" to give him the coffee for free because he was a frequent customer. (PSOF ¶ 7.) She told Harris that he should have gotten a card punched; he told her that he would be back after getting some money from home. (PSOF ¶ 8.)

The parties' facts are in dispute as to what happened at the café that day. The Court accepts Harris's version of the facts. However, Holly Hall, an employee of the café, reported a different version of events to the police. Her version remains relevant because Harris has not disputed that Hall provided the police with her version of events.

On March 6, 2013, a barista at Café Passe named Holly Hall noticed that her regular customer named Deyoe Harris looked messy and dirty and was acting strangely - babbling to himself about meeting with God and needing to go to a place to meet God. (Doc. 128, R-004:7-11, 17 to R-005:7.) At first she thought Harris was joking but then

she realized Harris was either on drugs or having a mental illness episode. (R-005:6-15; R-006: 9-15.) Hall then told Harris to leave. (R-005:16.) Harris slammed his hand down on the counter in a frantic manner yelling at her to make him his drink and that he needed to go meet God. (R-005:16-20.) Harris moved toward the corner of the counter and started to climb over the counter reaching and swinging around her, but he lost his balance and fell onto the counter. Hall screamed for him to get out. (R-005:21 to R-006:2, R-006:20-23.) Harris got off the counter, walked toward the door, ran straight into the screen door, and then backed up, opened up the screen door and walked out. (R- 006:3-8.) A short time later, Hall flagged down a Tucson Police Department (TPD) bike police officer (Pelton) and told him what had happened and that he should find Harris because he was being violent and dangerous. (R-006:24 to R-007:6, 7:9-19; R-018 ¶¶ 3, 4; R-021 ¶ 1.) Police officers checked the area with negative results. (R-021 ¶ 1.)

Contemporaneously, Andrew Aragon was unloading equipment from a delivery truck parked in the middle of 4th Avenue, near his place of work, 802 North 4th Avenue. (R-009:6-9; R-010.) When a male (later identified as Harris) came around the truck, yelling and screaming obscenities. Harris asked Aragon if he had a gun because he was going to kill someone. (R-011:4-10, 13-18.) As Harris walked away, Aragon noticed that he appeared angry, yelling and screaming at cars while walking alternatively in the street and on the sidewalk. (R-013:15-19.) Aragon got the impression that the man was having mental health issues and was a danger to others because he was asking for a gun. (R-014:2-11; R-015:4-7.) At 11:59 a.m., Aragon called 911 reporting that a man was walking in the road and screaming saying he wants a gun to kill people. Aragon described the man as a white male in his 20s, long hair, beard, brown shirt, back pack, and flip flops who appeared to be on something. (R-016.) Officer Pelton responded and spoke with Aragon. Aragon told Pelton that a male walked up to him and appeared to be on drugs and stated, "I need a gun." Aragon told the man that he didn't have a gun. The man got more agitated and walked north in the middle of 4th Avenue and began hitting himself in the head and yelling at cars driving by him. (R-018 ¶ 1.) Officers Pelton, Placencia, and

Allen approached 4th Avenue and 6th Street on bicycles and Pelton could hear a man yelling who matched the description. Police later identified the man as Deyoe Harris. (R-018 ¶ 2; R-021 ¶ 2; R-023 ¶ 1.)

While walking north on 4th Avenue (around Delectables), two TPD officers on bikes stopped Harris. They asked him where he was going. He explained his schedule and where he was going and told them if they didn't have a compelling reason to hold him that he was executing his right to leave. (PSOF ¶ 9.) They let Harris go and he proceeded to 333 West Drachman Road via 5th Street. (PSOF ¶ 10.) As Harris came to the next north-south street, Herbert, a cop car pulled into the intersection and got out of the car. (PSOF ¶ 11.) Harris approached with his hands up trying to explain that he had just spoken to two officers with his hands up. (PSOF ¶ 12.) The officer started to yell at Harris and as Harris stopped with his hands in the air, the officer went for his hip. (PSOF ¶ 13.) Harris turned and ran, taking off his backpack as he ran back toward 4th Avenue (PSOF ¶ 14.) As Harris ran, he heard two pieces of metal hit the ground and turned around with his hands up to discover the officer out of the car with his hands on his taser looking at him. (PSOF ¶ 15.) Harris kept his hands up trying to communicate with the officer but within a second he was knocked out from behind. (PSOF ¶ 16.) Harris woke up in cuffs on his hands and feet and a white bag on his face. (PSOF ¶ 17.)

Harris states that he was shocked in the back several times while on the ground and the force stood him up and broke the seam of his shoes. (PSOF ¶¶ 19, 20.) This assertion by Harris is contradicted by the record of Officer Dellinger's taser. The TASER X26, serial number X00666884, used by Dellinger during this incident has an internal data recording system which cannot be altered. (R-054 ¶ 4; R-055 ¶ 6.) The record shows Dellinger's taser was deployed three times on March 6, 2013: at 12:09:13 for 3 seconds, at 12:09:34 for 6 seconds, and at 12:09:42 for 5 seconds. (R-055 ¶ 8; R-056.)

Officer Dellinger and Harris agree that the weapon was fired one time without making full contact with Harris. (PSOF ¶ 15; R-021.) Officer Dellinger states that he fired a second time, making contact with Harris's back. (R-021, R-027.) The Court

accepts this assertion by Officer Dellinger. Although Harris suggests he was facing Dellinger, he asserts he was "knocked out" from behind. Because these two statements agree in material part, the Court accepts Officer Dellinger's statement that the second firing of the taser was at a distance in dart mode. Additionally, Harris points out that two taser cartridges were collected at the scene; this corroborates Officer Dellinger's account that he used the taser twice in dart mode and made contact with Harris's back. (Doc. 29-1 at 3-4). *See Mattos*, 661 F.3d at 443 (explaining that a cartridge is used only when the taser is in dart mode and the cartridge is removed when used in stun mode). This leaves only one other recorded use of the taser. Harris stated he was stunned in the back, while Officer Dellinger testified he stunned Harris in the calf. (PSOF ¶ 19; R-027 ¶ 7.) Thus, there is agreement that the taser was used against Harris in stun mode one time while he was on the ground.

Heivilin and Krammes restrained Harris with the Total Appendage Restraint Procedure (TARP) and placed a spit sock on his head to avoid contact with the fluids coming from his mouth and nose. (R-021, R-023, R-034.) The Total Appendage Restraint Procedure (TARP) is the simultaneous securing of a person's arms and legs. The arms are restrained with handcuffs while the legs are restrained at the ankle using a hobble or ripp restraint device. The leg restraint is then clipped to the handcuffs. (R-062 ¶ 2.) Officers placed Harris face-down on the ground. (R-023; R-038.)

At about 12:13 p.m., Tucson Fire Department personnel arrived at the scene and evaluated Harris. (R-043.) The officers explained how transportation would go, with which Harris complied completely. (PSOF ¶ 21.) Harris's legs were wrapped in sheets, the shackles on his feet removed, and he was put into the back of the ambulance. (PSOF ¶ 22.) Harris was transported to Banner South hospital. (PSOF ¶ 23.) Harris was repeatedly asked if he was on "spice" which he denied; he states that the reports indicating that he admitted using spice are false. Harris states he was sober for his midterm later that day. (PSOF ¶¶ 24, 28.)

The UMC South Campus (Banner South) medical reports of Harris's condition are summarized as follows:

- At 1:37 p.m., Dr. Thomas wrote, "[a]t this time, the patient continues to say he smoked spice." At this time, the patient states he is being "chased from LA," he states his "heart hurts because of a girl," and he states he has "hallucinations related to his vision quest." He only states he has pain in his feet from running outside. (R-046)
- At 2:00 p.m., "blisters on both feet occurred when he was running from police." (R-047)
- At 2:47 p.m., "pt talking about heaven and hell rambling and picking at scabs on feet = observed eating blister." Patient told medic "they are coming for him and if (medic) will assist him take out a couple of them before they kill him." (R-047)
- 2:32 p.m., "pt currently sleeping with eyes closed…"
- The differential diagnosis was: depression, acute psychosis, polysubstance abuse, drug/ETOH withdrawal, bipolar disorder, suicidal ideation. (R-049)
- Patient denies any physical complaints except foot pain, the patient has abrasions to bilateral feet, no signs of boney injury or trauma. The patient was agitated and there was concern patient was a danger to himself and others. (R-049)
- The clinical impression was: spice use, acute psychosis, tachycardia, resolved. (R-049)
- Patient will be evaluated by psychiatry as there is concern the patient is acutely psychotic for psychiatric reasons versus substance abuse. (R-049)
- Psychiatric: The patient is positive for psychosis, visual hallucinations, and auditory hallucinations. (R-050)
- At 3:32 p.m., he was reported to be sleeping. (R-047)
- At 8:00 p.m., he said he had been under the influence of marijuana when he was brought in by the police. (R-047)
- At 9:22 p.m., he was discharged following an evaluation by the Psychiatry department who stated he was not a danger to himself. (R-052)

The hospital lab results were positive for cannabinoids and negative for amphetamines, barbiturates, benzodiazepines, cocaine metabolite, opiates, and phencyclidine. (Doc. 29-1 at 28.) Harris was released under his own recognizance and slept on the hospital property until the sun came up and he could get on a bus home. (PSOF 30.)

Defendants' version of the contact between Harris and the officers stands in stark contrast to that offered by Harris. Defendants state Harris was non-compliant and combative throughout the entirety of the interaction with the police. (Doc. 127 at 2-4.) As stated above, the Court must look at the facts in the most favorable light to Plaintiff in

addressing the motion for summary judgment. This decision has no bearing on the manner in which a jury might interpret the facts at the time of trial.

## **DISCUSSION**

Defendants argue they did not use excessive force against Harris and that, alternatively, they are entitled to qualified immunity because the law was not clearly established. Additionally, Defendants Pelton, Placencia, Krammes, and Heivilin argue that Harris has not established any liability on their part.

### **INDIVIDUAL DEFENDANTS**

Four of the individual defendants, Pelton, Placencia, Krammes, and Heivilin, argue that Harris failed to connect their conduct with his alleged injuries. In response, Harris alleges only that he has established each of these officers' accounts as false; therefore, his version of the facts ought to be honored. (Doc. 137 at 16-17; Doc. 140 at 26-27.) With respect to Officer Krammes, Harris also alleges that he is responsible for excessive force by association with the other officers. (Doc. 137 at 17; Doc. 140 at 27.)

For liability under § 1983, there must be individual personal participation in the alleged deprivation of the constitutional right, it is not enough that the person was present or part of a group. *See Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). In taking Harris's facts in the light most favorable to him, the only use of force he describes as excessive is Officer Dellinger's use of a taser. Harris's allegations that the other officers were dishonest are entirely separate from the alleged constitutional violation arising from the use of excessive force, the claim before this Court. Defendants Pelton, Placencia, Krammes, and Heivilin have established that there is not a material factual dispute and they did not use excessive force against Harris. The Court will grant summary judgment as to these Defendants.

### **QUALIFIED IMMUNITY**

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235–36 (2009).

**Did Defendant Dellinger Use Excessive Force?**

An excessive force claim in the context of an investigatory stop of a person is analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The relevant question when assessing the force used to affect the "seizure" of a person is, "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to the underlying intent or motivation." *Id.* at 397. The officer's actions are to "be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Evaluation of the reasonableness of the use of force "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

The use of a taser in dart mode is considered an intermediate, "significant level of force." *See Bryan v. MacPherson*, 630 F.3d 805, 810-11 (9th Cir. 2010). The Ninth Circuit has not classified the level of force employed by a taser in stun mode. *Mattos*, 661 F.3d at 443. However, as the taser was used on Harris in both dart mode and stun mode, the Court finds a significant level of force was employed against Harris. *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012) (finding considerable use of force when taser deployed multiple times in both dart mode and stun mode).

In assessing the government interest in use of the force, the Court must consider the totality of circumstances as relevant to a particular case, including: the severity of the crime at issue, whether the person is an immediate threat to the officers or others' safety, and whether the person actively resists or attempts to evade the officers. *See Graham*, 490 U.S. at 396; *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). There is no

dispute that the officers had information, prior to making contact with Harris, to support a belief that Harris could be a danger to himself or others.[1] However, the fact that the officers were investigating a potentially "emotionally disturbed" individual rather than the commission of a serious crime diminishes the government's interest in using force. *See Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001).[2] Accepting Harris's version of the facts, once the officers approached Harris he was not combative and spoke to them with his hands raised. Under Harris's factual scenario, he posed no threat to the officers and offered no active resistance. Defendants offered no evidence that Harris was armed. Harris began to run only when he believed the officer was drawing a weapon. An additional factor to consider is that Officer Dellinger failed to warn Harris that deployment of the taser was imminent.[3] *See id.* at 1283-84 (holding that warnings should be given when feasible); *Bryan*, 630 F.3d at 831. Under these circumstances, a jury certainly could find that the use of a taser was not reasonable because the level of force was excessive compared to the government interests at stake. *See Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (noting the most important factor in the use of force is whether the person is an immediate threat to the officers' or others' safety) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)).

---

[1] In their motion for summary judgment, Defendants state this as their intent in stopping Plaintiff. (Doc. 127 at 9.) They also state that they had probable cause to arrest him for misdemeanor disorderly conduct and assault. (*Id.*)

[2] Defendants submitted a Notice of Supplemental Authority alerting the Court to the Sixth Circuit case of *Estate of Hill by Hill v. Miracle*, 853 F.3d 306 (2017). (Doc. 162.) In *Hill*, the court proposed a distinct test for determining whether an officer's actions were reasonable when dealing with a person facing a medical emergency rendering him irrational. *Id.* at 314. Accepting the facts in the light most favorable to Plaintiff, when the officers encountered Plaintiff he was not experiencing a medical emergency or behaving irrationally. Further, the Ninth Circuit has declined to apply a separate excessive force test for individuals that are mentally ill rather than serious criminals. *See Hughes v. Kisela*, 862 F.3d 775, 781 (9th Cir. 2017) (citing *Bryan*, 630 F.3d at 829); *Deorle*, 272 F.3d at 1283.

[3] Officer Dellinger called out "taser, taser, taser" to advise the other officers and then fired. (Doc. 128, R-021, R-027.) There is no evidence any officer warned Plaintiff that a taser would be fired if he did not act in a certain manner.

Defendants do not argue they are entitled to summary judgment based on Harris's version of the facts. (Doc. 153 at 3.) Rather, they argue that Harris's version of events and his state of mind is refuted by the medical records from that day, in which the doctors diagnosed psychosis, visual hallucinations, and auditory hallucinations." (*Id.*) While this may be powerful evidence for the jury, a medical examination conducted more than an hour after the police interaction concluded does not compel, as a matter of law, a finding on the reasonableness of the officers' actions. As the Ninth Circuit has repeatedly held, the reasonableness of the use of force is ordinarily a question for the jury. *Liston v. Cty. of Riverside,* 120 F.3d 965, 976 n.10 (9th Cir. 1997); *see also Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002) ("Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.") Here, there remain significant questions of fact about the severity of the threat posed by Harris; therefore, the Court cannot grant summary judgment to Officer Dellinger on the reasonableness of his actions. *Hughes*, 862 F.3d at 782.

**Was the Right Clearly Established?**

The Court moves to the second element of a qualified immunity analysis, whether the use of excessive force in the circumstances was clearly established such that a reasonable officer would have known his actions were unlawful. The qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). For qualified immunity purposes, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right," and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the

plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991). The Ninth Circuit has recently emphasized that "[a]lthough a plaintiff need not find 'a case directly on point, . . . existing precedent must have placed the . . . constitutional question beyond debate.'" *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also City & Cty. of San Fran. v. Sheehan*, — U.S. — ,135 S. Ct. 1765, 1775-76 (2015) ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality."). Thus, "a plaintiff must prove that 'precedent on the books' at the time the officials acted 'would have made clear to [them] that [their actions] violated the Constitution.'" *Hamby*, 821 F.3d at 1091 (quoting *Taylor v. Barkes*, —U.S. —, 135 S. Ct. 2042, 2044 (2015)). In evaluating qualified immunity the Court looks at the law clearly established as of the incident, which occurred in March 2013; therefore, cases decided after that date are not instructive.[4]

Prior to 2008, it was clearly established that using a taser in dart mode is excessive against a person for mere passive resistance. *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093-94 (9th Cir. 2013). In 2010, the Ninth Circuit held that using a taser in dart mode against a stationary unarmed individual (who appeared mentally disturbed but not violent) at a distance such that he did not pose an immediate threat was excessive to effectuate an arrest for misdemeanor offenses. *Bryan*, 630 F.3d at 832 (finding there were other less intrusive alternatives to affect the arrest). In 2011, it was clearly established that using a taser in dart mode was excessive against a non-violent domestic violence victim that posed no threat to the officers and, at most, minimally resisted the arrest of her partner. *Mattos*, 661 F.3d at 451-52. It also was clearly established in 2011 that using

---

[4] Plaintiff relies heavily in his filings on the case of *Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst*, 810 F.3d 892 (4th Cir. 2016). That case involved the 2011 tasing of a mentally ill man who was stationary and non-violent. *Id.* at 900-02. That court determined the officers used excessive force under the circumstances; however, the court found the officers were entitled to qualified immunity. *Id.* at 909. Because this case was not decided until 2016, several years after the 2013 incident at issue in this case, it is not relevant to this Court's analysis.

- 12 -

a taser in stun mode was excessive when applied to a pregnant individual being arrested for minor offenses who resisted getting out of the car but was not a potential threat to the officers. *Id.* at 444-46. Here, taking the facts in the light most favorable to Harris, he was cooperative and not offering resistance. Based on the state of the law in 2013, an officer could not have believed in those circumstances that it was reasonable to use a taser on Harris in dart mode and stun mode. Therefore, Officer Dellinger is not entitled to qualified immunity at the summary judgment stage. The application of qualified immunity in this case will turn on the facts as determined by a jury.

## **CONCLUSION**

The Court grants summary judgment to Defendants Placencia, Pelton, Krammes, and Heivilin because they have established that there is no genuine question of fact that they did not personally participate in any use of excessive force against Harris. Because genuine issues of material fact exist as to whether Harris was combative or calm and acting without resistance when approached by the police, Defendant Dellinger is not entitled to summary judgment on either Harris's excessive force claim or the issue or qualified immunity.

The next step in this case is preparation for trial against Defendant Dellinger. If Harris would like the Court to seek counsel to represent him pro bono for trial, he should file a motion making that request.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 127) is **DENIED in part** as to Defendant Jeffery Dellinger and **GRANTED in part** as to Defendants Stephen Placencia, Michael Pelton, Michael Krammes, and Stephanie Heivilin. The Clerk of Court should **DISMISS with prejudice** Defendants Placencia, Pelton, Krammes, and Heivilin.

**IT IS FURTHER ORDERED** that, on or before **August 31, 2017**, Plaintiff shall file a motion requesting appointment of pro bono counsel OR file a notice that he intends to represent himself at trial.

**IT IS FURTHER ORDERED** that the 30-day deadline for filing the proposed pretrial order is **VACATED**. After the matter of Plaintiff's representation is resolved, the Court will set a schedule for the remaining pretrial events.

Dated this 14th day of August, 2017.

_____
Honorable Lynette C. Kimmins
United States Magistrate Judge